**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission,<br><br>                    Plaintiff,<br><br>vs.<br><br>Sunfire Glass, Inc., an Arizona Corporation,<br><br>                Defendant.<br><br>_____<br><br>Tineke Meyer, an adult woman; and Karina Mercado, an adult woman,<br><br>                Intervenors,<br><br>vs.<br><br>Sunfire Glass, Inc., an Arizona Corporation,<br><br>                Defendant.<br>_____ | No. CV-08-1784-PHX-LOA<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER** |

       A default damages hearing was held on March 12 and 20, 2009 as a result of the entries of default against Defendant Sunfire Glass, Inc. ("Sunfire"), an Arizona Corporation, on the EEOC's and Intervenors' Complaints. (docket ## 22 and 28)  Pursuant to Fed.R.Civ.P. 52(a), the Court enters its findings of fact and conclusions of law.

## I. Jurisdiction

The Court has subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and was instituted pursuant to Section 706 (f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3); and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. (docket # 1 at 2)  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

All parties have previously consented in writing to magistrate-judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).  (docket ## 6, 12)  Despite the absence of Defendant Sunfire's consent to magistrate-judge jurisdiction, this Magistrate Judge has jurisdiction to conduct this hearing and enter final judgment against Sunfire. *United States v. Real Property*, 135 F.3d 1312 (9th Cir. 1998); *United States v. 8136 S. Dobson Street*, 125 F.3d 1076 (7th Cir.1997);  *EEOC v. West Louisiana Health Svcs., Inc.*, 959 F.2d 1277, 1279-80 (5th Cir.1992); *Giove v. Stanko*, 882 F.2d 1316, 1318 (8th Cir. 1989).

## II. Background

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed its Complaint on September 29, 2008, alleging that Defendant Sunfire, through its owner and President Paul McBride, subjected charging parties and Intervenors Tineke Meyer ("Meyer"), Karina Mercado ("Mercado") and a class of female employees to sexual discrimination and harassment in violation of Title VII and the Civil Rights Act of  1991. (docket # 1) The EEOC further alleges that Meyer and Mercado were constructively discharged as a result of a hostile work environment in violation of Title VII and the Civil Rights Act of 1991. After obtaining leave of the Court, Meyer and Mercado filed their Complaint in Intervention on January 20, 2009, alleging similar claims in violation of Title VII, requesting equitable relief (back pay) and monetary damages.  (docket # 16)

Defendant Sunfire was properly served with the Complaints on October 27, 2008 and January 26, 2009, docket ## 7, 24, and has not filed an answer, responsive pleading or otherwise appeared in this action. Defendant Sunfire was given ample notice and

1    opportunities to defend these suits, and there is no evidence to suggest Defendant Sunfire's

2    default is the result of excusable neglect. On January 26, 2009 and February 25, 2009, the

3    EEOC and Intervenors filed applications for entry of default against Sunfire. (docket ## 20,

4    27)  On January 27, 2009 and February 27, 2009, the Clerk of the Court, pursuant to Rule

5    55(a), FED.R.CIV.P., entered defaults against Sunfire for failure to file an answer or

6    responsive pleading.  (docket ## 22, 28)

7           Because the Complaints sought non-liquidated damages and injunctive relief

8    that were not "for a sum certain or a sum that [could] be made certain by computation"

9    within the meaning of Rule 55(b), FED.R.CIV.P., the Court conducted an on-the-record Rule

10   55(b)(2) default damages hearing over a period of two days. To assist the undersigned in

11   conducting the damages hearing and fairly establishing the amount of back-pay,

12   compensatory, punitive damages and injunctive relief Plaintiffs may be entitled, the Court

13   required Plaintiffs to timely file in advance of, and after, the hearings various documents and

14   briefings. (docket ## 21, 50)  Plaintiffs have complied with the January 27, March 12 and

15   March 20, 2009 orders.

16          Following entry of default, Rule 55(b)(2), FED.R.CIV.P., permits a district court

17   to enter final judgment in a case.  Entry of default judgment, however, is not a matter of

18   right. *Warner Bros. Entm't Inc. v. Caridi*, 346 F.Supp.2d 1068, 1071 (C.D. Cal. 2004). Entry

19   of  default judgment is entirely within the district court's discretion and may be refused if the

20   district court determines no justifiable claim has been alleged or that a default judgment is

21   inappropriate for other reasons. *Draper v. Coombs*, 792 F.2d 915, 924 (9th Cir. 1986) and

22   *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.1980)).  Well-pleaded factual allegations of

23   the complaints are taken as true, except for those allegations relating to damages. *Philip*

24   *Morris USA, Inc. v. Castworld Prods., Inc.,* 219 F.R.D. 494, 498 (C.D. Cal. 2003) (citing

25   *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987)); *Geddes v. United*

26   *Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977); *Beck v. Atlantic Contracting Co.*, 1994

27   WL 608598, at *1 (D. Kan. 1994) (entering default judgment and accepting as true the

28   allegations regarding defendant's willful and wanton conduct entitling plaintiff to recover

1    punitive damages).

2           The Ninth Circuit has enumerated seven factors for a district court to consider

3    in determining whether to grant a default judgment: (1) the merits of the plaintiff's

4    substantive claim; (2) the sufficiency of the complaint; (3) the sum of money at stake in the

5    action; (4) the possibility of prejudice to the plaintiff; (5) the possibility of a dispute

6    concerning material facts; (6) whether the default was due to excusable neglect; and (7) the

7    strong policy underlying the Federal Rules of Civil Procedure favoring decision on the

8    merits. *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986); *Truong Giany Corp. v. Twinstar Tea*

9    *Corp.*, 2007 WL 1545173 (N.D. Cal. 2007).

10   **III. Findings of Fact**

11          1.  Defendant Sunfire is owned by Paul McBride.  Mr. McBride is also

12   President of Sunfire.  (Tineke Meyer Hearing Testimony on March 12, 2009, hereafter

13   "Meyer" 9:6-8, 23:10-12, Karina Mercado Hearing Testimony on March 12, 2009, hereafter

14   "Mercado"46:16-18)

15          2.  Defendant employed approximately 30 employees during the relevant time

16   period, i.e. September 2004 through December 2006.  (Meyer 20:6-8, Mercado 46:19-21)

17          3.  Plaintiff-Intervenor Tineke Meyer was hired by Defendant as a glass

18   blower on September 20, 2004.  (Meyer 8:14-17, 30:16-19)

19          4.  Plaintiff-Intervenor Karina Mercado was hired by Defendant as a glass

20   blower on July 17, 2005.  (Mercado 45:22-46:1, 46:9-10)

21          5.  The EEOC and the Arizona Civil Rights Division ("ACRD") have a long-

22   standing worksharing agreement which defines their obligations with respect to charges of

23   discrimination and is renegotiated every year. (docket # 36, Exhibit ("Exh") 4, Worksharing

24   Agreement between ACRD and EEOC for FY2008). As a result, the EEOC and ACRD have

25   designated each other as their agents for receipt of charges and thus filing a charge with one

26   agency constitutes constructive receipt by the other agency. *EEOC v. Dinuba Med. Clinic*,

27   222 F.3d 580, 585 (9th Cir. 2000) ("Constructive filing is made possible by 'worksharing

28   agreements,' which designate the EEOC and the state agency each other's agents for the

purpose of receiving charges.")

6. Meyer filed her charge concurrently with the EEOC and ACRD on January 16, 2007. (docket # 50, Exh. 1, Meyer EEOC Charge)

7. Mercado filed her charge concurrently with the EEOC and ACRD on January 16, 2007. (docket # 36, Exh. 1, Mercado EEOC Charge)

8. Because Meyer and Mercado timely filed their sexual harassment charges on January 16, 2007, their charges were well within the 300-day statute of limitations.

**A. TINEKE MEYER**

9. In 2004, shortly after Meyer was hired, McBride began lifting his shirt to expose his chest to Meyer and telling Meyer to "show me your tits."  (Meyer 11:15-17, 30:20-25)

10. McBride repeated this conduct frequently throughout Meyer's employment.  (Meyer 15:24-16:4)

11. On at least one occasion, Meyer's son overheard McBride tell Meyer to show McBride her "tits."  Meyer's son was approximately eight years old at the time. (Meyer 11:15-24)

12. Meyer told McBride that his comment was inappropriate and she did not wish to hear it.  (Meyer 12:3-7)

13. On another occasion, McBride commented to Meyer regarding her hiking outfit.  He told her "how hot she looks," and that her spandex shorts were tight.  (Meyer 13:18-25)

14. McBride attempted to grab Meyer's buttocks on several occasions when at work.  Meyer would move out of the way to avoid contact with McBride.

15. McBride would place glass tubing over his genital area as though it was his penis.  He would then dance around the workplace while holding the tubing over his genital area. He did this in front of Meyer, Mercado and other employees.  (Meyer 21:10-17; Mercado 50:23-51:20; Leonard Johnson Hearing Testimony on March 20, 2009, hereafter "Johnson" 98:9-24)

16. On various occasions, McBride told Meyer that her shirt made her "have bigger boobs" and were going to "pop out" or "fall out."  (Meyer 14:9-13, 41:1-4)

17. McBride frequently told Meyer that she had a "nice ass" when she was bending down to retrieve glass from the shelving unit.  (Meyer 12:13-21)

18. Meyer began to alter her conduct to avoid McBride's comments. For example, she would turn in the opposite direction to retrieve the glass.  (Meyer 12:13-21, 14:1-8)

19. On one occasion, Meyer went with her children and co-worker Leonard Johnson to dinner with McBride and his wife.  At the restaurant, McBride told Meyer how "hot she looked" and later McBride grabbed Meyer's buttocks.  (Meyer 16:13 – 17:6, L. Johnson 103:5-24)

20. McBride attempted to grab Meyer's buttocks on several occasions when at work. In or around September 2006, Meyer was negotiating a loan with McBride for approximately $300.  During the conversation, McBride reached out to Meyer and grabbed her hips and forced Meyer to sit on McBride's lap. (Meyer 20:5-21:2) On another occasion, Meyer was discussing some personal problems she was having and McBride grabbed Meyer's hips and forced her to sit on his lap. (Meyer 17:19-18:4)  Meyer would find ways to avoid contact with McBride to prevent any additional harassment.  (Meyer 16:13-17:6, 44:2-8)

21. Meyer asked McBride if she could participate in an annual meeting held in Las Vegas, Nevada, for individuals involved in glass blowing.  McBride told Meyer the only way for her to go to the meeting would be if she agreed to wear "pasties on her titties" and share a room with McBride.  Meyer responded, "Well, then I'm not going to Vegas." (Meyer 12:22-13:16, Johnson  103:5-24)

22. On several occasions, McBride would walk up to Meyer when she was sitting at lunch and begin to rub her shoulders.  (Meyer 18:14-21)

23. Meyer rejected McBride's advances and constantly told him that his conduct would have to stop.  He refused to comply.  (Meyer 12:3-7, 17:7-9, 18:5-13, 21:7-9,

38:23-39:5)

24. McBride invited Meyer and her children to his house to swim. McBride told Meyer that his wife was out of town and he wanted to see Meyer in a swimsuit. (Meyer 15:9-23, 16:5-11)

25. McBride later told Meyer he did not intend to have the children come over so that they could have gone swimming at night alone and "who knows what could happen after that." (Meyer 15:9-23)

26. Meyer complained to Jodi Wells, Sunfire's Office Manager, that she was being sexually harassed by McBride. She also notified Shipping Manager William Acosta and Manager Leonard Johnson about McBride's conduct. (Meyer 27:1-20, 37:19-38:1, Johnson 103:5-24)

27. On several occasions, Johnson spoke to McBride about his conduct with Meyer, and other female employees. McBride replied, "if they don't like it, why don't they tell me?" (Johnson 103:25-104:5)

28. In or around October 2006, Meyer was sitting at a table blowing glass. McBride walked by, leaned over Meyer, reached for her genital area, grabbed her crotch, and pretended to remove a piece of glass from between her legs. McBride told Meyer that he was reaching for a piece of "hot glass." (Meyer 18:22-19:8)

29. Meyer brought her sixteen-year-old daughter to work. Meyer's daughter was waiting in the front office while Meyer worked.    (Meyer 14:14-15:6)

30. After being in the office with Meyer's daughter for several minutes, McBride came out of the office and told Meyer that her daughter was just like her mother, "she wouldn't show me her tits either." (Meyer 14:14-15:6, 27:23-28:6; Johnson 104:6-11)

31. Meyer went on vacation on or around October 31, 2006. After her vacation, Meyer resigned from Sunfire Glass because she could no longer tolerate the sexual harassment. (Meyer 28:7-17)

32. Meyer filed her EEOC charge on January 16, 2007, alleging sexual harassment. (Tineke Meyer's EEOC charge, Exhibit 1)

33. Sometime in January 2007, McBride met with Meyer and apologized for not being a "nicer person" to her. (Meyer 23:13-24, 28:18-20)

34. McBride's sexual conduct toward Meyer was unwelcome. Meyer felt intimidated by McBride and often tried to avoid him so that he would not harass her. (Meyer 14:1-8, 21:3-9, 44:2-8)

**B. KARINA MERCADO**

35. Karina Mercado began her employment with Sunfire Glass as a glass blower in late July/early August 2005. (Mercado 45:22-46:1, 46:9-10)

36. McBride began sexually harassing Mercado a few weeks after she started working for Sunfire. The sexual harassment continued until her constructive discharge in May 2006. (Mercado 46:2-3, 47:20)

37. Throughout Mercado's employment, McBride repeatedly touched Mercado between her legs while she was handling hot glass, commented that he liked and wanted her breasts, asked her to have sex with him in exchange for money, made sexual tongue gestures to her, actually kissed her near her lips, and pretended to strip dance while grabbing his crotch and making motions to his genital area in front of her. (Mercado 46:25-47:14, 47:21-48:7, 49:9-14, 50:23-51:20)

38. McBride would constantly stand close to Mercado and stare at her breasts while she was making the glass pieces. (Mercado 46:25-47:7, 47:17-20)

39. Approximately two and a half months after she started working for Sunfire, McBride, a married man, began asking Mercado out on a date even though he knew she was married. He offered to pay her money if she slept with him. Mercado told him she was married and she did not want to go out with him. He did this on several occasions. (Mercado 46:25-47:14)

40. Sometime in the December 2005, McBride approached Mercado, kneel-ed in front of her, pulled her chair toward him and put his hands in between her legs, and rubbed her vaginal area. He told her, "You look hot today." Mercado was startled and immediately told him to leave her alone and reminded him that she was married. She then

got up, left her work area and went to the bathroom and cried.  (Mercado 49:15-50:5)

41. During a holiday dinner in December 2005, McBride tried to kiss Mercado on the lips but instead kissed her on the cheek because Mercado was able to move her face away to avoid him.  He told her she was just a cry baby. (Mercado 46:25-47:7, 50:6-13)

42. On at least one occasion, McBride approached a male co-worker who sat next to Mercado, pinched his nipples and told him, "Those are the nipples that I want," motioning toward Mercado.  He then stared at her and moved his tongue up and down in a sexual manner. Mercado was shocked by McBride's conduct and she ran to the bathroom crying. (Mercado 53:8-54:12)

43. On another occasion, when McBride saw that Mercado was sweating at work, he stated, "Oh, that's how your husband makes you sweat.  I would like to feel that sweat myself."  (Mercado 54:13-55:15)

44. Mercado's husband, Jose, began working for Sunfire sometime in January 2006.  Mr. Mercado did not work alongside Mrs. Mercado.  Therefore, McBride was able to continue his sexual harassment of Mercado without her husband's knowledge.  (Mercado 55:16-21; Jose Mercado Hearing Testimony on March 20, 2009, hereafter "J. Mercado" 115:23-116:2)

45. Mercado complained of McBride's sexual harassment to William Acosta, a Sunfire manager, on several occasions, starting in September 2005 and up until the day she resigned in May 2006. (Mercado 48:21-49:2, 52:2-10, 54:13-55:15)

46. Mercado also complained to Leonard Johnson, another Sunfire manager and Vicente (last name unknown), another Sunfire manager, about McBride's harassment and sexual behavior.  (Mercado 52:2-25; Johnson 107:4-11)  McBride's sexual harassment, however, did not stop.

47. Mercado complained to Johnson that McBride would tell her "show me your tits", and touched her inappropriately by rubbing her back and shoulders.  (Johnson 107:8-11)

48. Despite her repeated complaints to management and her repeated requests

to McBride to stop, McBride's sexual harassment continued.  Mercado felt she had no other choice but to resign, i.e. constructive discharge, in May 2006. The day she resigned, McBride put his hands between her legs again and rubbed her. He acted like he didn't care about Mercado's feelings and he would laugh as McBride walked away from her. (Mercado 47:21-48:7, 48:21-49:2, 53:1-7, 55:22-57:12)

49. Mercado filed her EEOC charge on January 16, 2007, alleging sexual harassment.  (Mercado 27:24-58:1)

50. Sometime after Mercado filed her EEOC charge, McBride approached Mercado's husband, who at the time was still working for Defendant.  McBride apologized to Mr. Mercado for being disrespectful to Mrs. Mercado and other female employees.  He admitted to Mercado that Acosta had warned him about getting into trouble with the law if he did not stop his conduct.  However, McBride did not listen to Acosta's warning.  (J. Mercado 116:20-117:13, 119:25-120:11)

51. Shortly after his meeting with McBride, Mr. Mercado quit his job with Sunfire. He no longer felt comfortable working at Sunfire given what his wife had experienced.  (J. Mercado 115:25-116:2, 116:20-117:13, 118:15-20)

52. Sometime in early 2007, McBride held a meeting with Mercado, and two other female employees who had complained of McBride's sexual harassment.  He apologized for the way he treated them and told them "Oh, so this is about money.  So if it's about money, how much do you want?"  (Mercado 58:2-14, 67:23-68:25)

53. Mercado and the other women responded that it was not about money. They simply wanted the sexual harassment to stop. (Mercado 67:23-68:25)

54. McBride's sexual conduct toward Mercado was unwelcome.  Mercado rejected McBride's advances, felt intimidated by McBride and often tried to avoid him so that he would not harass her.  (Mercado 47:21-48:12, 50:14-22)

**C. DAMAGES – BACK PAY**

55. While at Sunfire Glass, McBride would change Meyer's rate of pay from hourly to piece work whenever Meyer refused his sexual advances. (Meyer 20:5-21:2, 32:2-

33:10)

56. As a result of McBride altering Meyer's method of pay, Meyer made substantially less in 2006 than she had in 2005. (Meyer 31:5-22, 32:2-33:10; Rosanne Wood Hearing Testimony on March 12, 2009, hereafter "Wood" 79:24-80:3, Hearing Exhibits 1,2)

57. After being constructively discharged from Sunfire, Meyer was unemployed for approximately two months. (Meyer 33:17-23) She subsequently found a job with WTC Glass Blower where she earned approximately $13,603 for tax year 2007. (Meyer 33:17-34:2, 35:10-11, Hearing Exhibit 3)

58. Meyer has worked with WTC Glass Blower from approximately January 2007 to the present. (Meyer 33:17-34:2, 34:22-23)

59. Meyer also obtained another job in June 2008 with Mountain Pacific Inspection Services where she earned approximately $15,544 in tax year 2008. (Meyer 34:15-17, 35:12-14, Hearing Exhibit 4)

60. Meyer's backpay claim with interest amounts to $60,287.56 through March 12, 2009. (Wood 80:24-81:1, Hearing Exhibit 8)

61. After being constructively discharged from Sunfire in May 2006, Mercado was unemployed for approximately two and a half months. She next found employment at Long Wong's Restaurant on or about August 2006. She worked there until mid-October 2006. She earned approximately $1,320 during the time that she worked for Long Wong's. (Mercado 59:4-14, docket # 38-2, Att. 3 – "Credited Earnings" for Quarter 3 and 4, 2006)

62. Mercado voluntarily resigned from her employment from Long Wong's in order to care for her four children at home. (Mercado 59:22-60:4)

63. There is no evidence or reason to believe that Mercado's decision to withdraw from the workforce in October 2006 was affected or caused by McBride's discriminatory treatment of her.

64. Mercado's back pay claim with interest amounts to $6,781.56 through March 20, 2009.

/ / /

**D. COMPENSATORY AND PUNITIVE DAMAGES**

65. As a result of McBride's sexual harassment, Meyer felt significant stress in the workplace.  She cried often and questioned constantly why McBride was treating her that way.  She cringed when she saw him coming toward her and often tried to avoid him. (Meyer 14:1-8, 23:25-24:16, 41:5-17, 44:2-8, Johnson 105:14-25)

66. Sometime on or about April 2006, Meyer went to see a counselor because she could no longer deal with the sexual harassment she experienced at Sunfire. She realized that not only was the harassment affecting her in the workplace, it was also impacting her relationship with her children because she was more short-tempered with them.  (Meyer 23:25-24:16, 24:25-25:3, 42:22-25,43:11-14, )

67. During this time, Meyer  experienced symptoms of anxiety, depression, stress and insomnia she attributes to her mistreatment at work by McBride. Her counselor prescribed medications, including Ativan, Clonazepam, Trazodone and Paxil, to control these symptoms.  (Meyer 25:7-26:14)

68. Meyer also experienced weight loss she attributes to McBride's sexual harassment.  (Meyer 24:17-19)

69. To date, Meyer continues to see a counselor and takes medication to treat her anxiety, depression and stress she believes was caused by McBride's sexual harassment. (Meyer 25:21-24)

70. Meyer went into an emotional shell due to McBride's sexual harassment. (Johnson 106:5-16)

71. As a result of McBride's sexual harassment, Mercado felt stress, humiliation and embarrassment.  She often ran to the bathroom to cry.  (Mercado 48:13-14, 51:21-24)

72. Mercado was depressed and did not look forward to going to work due to McBride's sexual harassment.  (Mercado 51:25-52:1, 54:1-12, 21-24)

73. Mercado felt more stress when her husband started working at Sunfire because she did not want her husband to know that she was being sexually harassed by

McBride.  She was afraid that he would become upset and do something inappropriate to McBride.  She was also afraid that they would both lose their jobs.  (Mercado 62:20-63:6)

74. After she quit her job at Sunfire,  Mercado continued to experience stress, humiliation and depression she attributes to McBride's sexual harassment.  She finally told her husband about the sexual harassment which caused significant strain in their marriage. (Mercado 62:12-63:19; J. Mercado 117:20-10)

75. Mercado and her husband began having marital problems because of McBride's sexual harassment. There was a period of time when they would not talk to each other.  She felt guilty and angry for what had happened.  Her husband was upset because she did not trust him enough to confide in him about McBride's sexual harassment.  (Mercado 62:20-63:19; J. Mercado 120:14-21, 121:2-7, 122:4-7)

76. Mercado's sexual relationship with her husband suffered as a result of McBride's sexual harassment at Sunfire. She did not want to be close and intimate to her husband anymore. (Mercado 62:12-63:6; J. Mercado 121:8-10)

77. Mercado's relationship with her children also suffered as a result of McBride's sexual harassment.  She was not as patient with them and did not have the energy to focus on their needs. Today, she continues to experience difficulty in her relationship with her children which she attributes to McBride's sexual harassment.  (Mercado 61:22-62:9; J. Mercado 121:20-25)

78. Mercado also experienced headaches, lack of sleep, loss of appetite and weight loss she believes is caused by McBride's sexual harassment.  (Mercado 61:22-62:9)

79. Mercado and her family experienced financial problems as a result of her quitting her job at Sunfire.  (Mercado 63:24- 64:1; J. Mercado 122: 1-2)

80. Currently, Mercado experiences some depression, low self-esteem, feelings of guilt and anger over what happened at Sunfire.  She and her husband continue to work on regaining the trust they had for each other before McBride's sexual harassment. (Mercado 63:20-23, 64:19-65:3, J. Mercado 121:11-19)

81. Mercado also has difficulty trusting men which she attributes to McBride's

sexual harassment.   She fears they have other intentions rather than mere friendship. (Mercado 64:6-17, J. Mercado 121:20-25)

82. During the time that Meyer and Mercado were employed by Sunfire, Sunfire did not have a sexual harassment policy.  Sunfire also did not conduct any training for its employees on sexual harassment. (Meyer 22:21-23:1; Mercado 58:15-21; Johnson 109:11-13)

83. Sunfire managers received various complaints of sexual harassment but failed to respond effectively to those complaints.  (Meyer 23:2-7, 37:19-38:11, Johnson 107:4-25)

84. McBride, the owner and President of Sunfire, continued to sexually harass Meyer and Mercado despite their constant demands that he stop his misconduct. (Meyer 12:3-7, 17:7-9, 18:5-13, 21:7-9, 38:23-39:5)

**IV. Conclusions of Law**

1. Plaintiffs brought this action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) against Sunfire to correct sexual discrimination and harassment and to provide appropriate relief to a class of working women, including Tineke Meyer and Karina Mercado.

2. Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

3. To establish federal subject-matter jurisdiction for a Title VII claim, a plaintiff must exhaust her remedies by filing an administrative charge of discrimination with the EEOC before commencing an action in federal court. *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002); *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001).

4. A Title VII plaintiff is required to "first file an EEOC complaint against the allegedly discriminatory party before bringing a Title VII suit in federal court." *Stache v. Int'l Union of Bricklayers & Allied Craftsmen, AFL-CIO*, 852 F.2d 1231, 1233 (9th Cir. 1988).

"Generally, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last act of discrimination." *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081-1082 (9th Cir. 2006) (citing 42 U.S.C. § 2000e-5 (e)(1)). The 180, or 300, day period serves as a "judicial statute of limitations . . . generally barring subsequent suit on discriminatory incidents occurring prior to the" 180- or 300-day period. *Sosa v. Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990).

5. If a Title VII plaintiff fails to file an EEOC charge within the statutorily-mandated deadline (180 or 300 days from the alleged discriminatory act), she is precluded from filing a civil action in federal court under Title VII. *Id.*

6. Title 42 U.S.C. § 2000e-5(e)(1)'s 180-day filing period is extended to 300 days if the charge is filed with a state agency pursuant to a worksharing agreement, even if the charge was first filed with the EEOC. *EEOC v. Commercial Office Prod. Co.*, 486 U.S. 107, 111 (1988). "The EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the [state] agency's proceedings within the meaning of [Title VII]." *Id.*; *Konrath v. Amphitheater Unified Sch. Dist.*, 2007 WL 2809026 (D. Ariz. 2007) (holding a state terminates its proceedings if it has waived the 60-day deferral period in a cooperative agreement - known as a worksharing agreement between the state agency and the EEOC).

7. The EEOC's, Meyer's, and  Mercado's Title VII claims are timely because their charges were filed on January 16, 2007, well within the 300-day statute of limitations.

8. Meyer and  Mercado have properly exhausted their administrative remedies by filing timely and sufficient charges with the appropriate administrative agency before filing suit in this District Court.  Title 42 U.S.C. §§ 2000e-5(b), (f)(3), and 16(c).

9. To prove actionable harassment under a *quid pro quo* or tangible employment action theory, a plaintiff must show that her employer "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994); *De La Torre v. Merck Enterprises, Inc*., 540 F.Supp.2d 1066, 1079 (D. Ariz. 2008).

10. To establish a *prima facie* hostile work environment claim under Title VII, an employee must show that: "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M & O Agencies, Inc*., 496 F.3d 1047, 1055 (9th Cir. 2007); *Torre*, 540 F.Supp.2d at 1080. "[A] sexually objectionable environment must be both objectively and subjectively offensive. . . ." *Id*. (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). "The objective measure of an abusive working environment is set by what a reasonable woman would consider abusive." *Davis v. Team Electric Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (citing *Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir.1991)).

11. The defaults entered in this action legally establish, and the evidence presented at the hearings substantively confirm, Sunfire's liability for egregious sexual harassment (*quid pro quo* harassment and hostile work environment) and constructive discharge of Meyer and egregious sexual harassment (hostile work environment) and constructive discharge of  Mercado. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990); *Bender Shipbuilding & Repair Co. v. Vessel Drive Ocean V*, 123 F. Supp. 2d 1201, 1208 (S.D. Cal. 1998), *aff'd w/out opinion*, 221 F.3d 1348 (9th Cir. 2000).

12. Paul McBride, owner and President of Sunfire Glass, subjected Meyer and Mercado to egregious and extreme sexual discrimination based on his mistreatment to them and others females in the workplace.

13. McBride's misconduct consisted of both verbal and physical sexual harassment.

14. McBride's misconduct was unquestionably unwelcome to Meyer and Mercado.

15.  McBride's misconduct was beyond sufficiently severe and pervasive, even criminal, to sustain Meyer's and Mercado's allegations of unlawful sexual harassment.

16. As Sunfire's owner and President, McBride is its alter ego. Defendant Sunfire Glass, Inc. is, therefore, strictly liable for his misconduct.  Sunfire is subject to strict

liability for its hostile work environment because the harassment was perpetrated by Paul McBride. *Faragher*, 524 U.S. at 789 (an employer is strictly liable if the harasser falls "within that class of an employer organization's officials who may be treated as an organization's proxy."); *Passantino v. Johnson and Johnson Cons. Prod. Inc.*, 212 F.3d 493, 516 (9th Cir. 2000) ("individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability.").

17. Sunfire cannot avail itself of any affirmative defenses because it is strictly liable for McBride's misconduct in the workplace.

18. Meyer and Mercado were constructively discharged due to the ongoing, almost daily, severe, egregious, criminal, and relentless sexual harassment perpetrated by McBride. A reasonable woman in the positions of Meyer and Mercado would have felt forced to quit under those same conditions.

19. An award of back pay to constructively discharged class members furthers Congress' goal of making victims of employment discrimination whole. *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000).

20. The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole. *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1448 (9th Cir.1990).

21. "[B]ackpay should be denied only for reasons which . . . would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995) (internal quotation marks omitted) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). See also *Caudle*, 224 F.3d at 1020 (stating that courts employ a presumption in favor of back pay awards).

22. Back pay is calculated by subtracting the actual wages a discharged employee earned subsequent to termination from the amount the employee would have earned absent the employer's discriminatory conduct. *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999); *Edwards v. Occidental Chemical Corp.*, 892

F.2d 1442, 1449 (9th Cir. 1990); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).  Back pay is generally calculated from the date of the discriminatory discharge until the date of the final judgment.  *Kraszewski v. State Farm General Ins. Co.*, 912 F.2d 1182, 1184-85 (9th Cir. 1990); *Edwards*, 892 F.2d at 1449.

23. Because of their constructive discharges, Meyer and Mercado are entitled to back pay.

24. Meyer is entitled to back pay through March 12, 2009, the only date for which such evidence was received, in the sum of $60,287.56.

25. Mercado is not entitled to either back pay after voluntarily leaving her job at Long Wong's Restaurant in October 2006 or equitable tolling until she returned to the workforce in April 2007, approximately six months after quitting her employment with Long Wong's.  Mercado "failed to show that her diminished income after [October 2006] was not 'voluntary' and was thus an injury for which she would need to be 'made whole' by" Sunfire. *Caudle*, 224 F.3d at 1020-1021.

26. Reasonable prejudgment interest should also be added to Meyer's and Mercado's back pay awards to fully effectuate the goal of providing make-whole relief, by compensating these employees for the loss of use of their money prior to judgment. *Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir. 1986) (granting prejudgment interest on back pay in Fair Labor Standards Act case to provide make-whole relief); *Satterwhite v. Smith*, 744 F.2d 1380, 1383 (9th Cir. 1984) (awarding prejudgment interest on back pay in an employment discrimination action filed pursuant to 42 U.S.C. § 1981, for the period following constructive discharge).

27. The rate of return on prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984). This discretion is exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *Id*.  The interest rate used to calculate  Meyer's and Mercado's back pay awards was reasonable.

28. Under Title VII, each charging party may be awarded non-pecuniary

compensatory and punitive damages up to a set amount depending on the size of the employer.  42 U.S.C. § 1981a(b)(3)(A-D). The damage's cap for employers, like Sunfire, with more than 14 but fewer than 101 employees is $50,000. This monetary cap applies here. 42 U.S.C. § 1981a(b)(3)(A).  Meyer and Mercado are entitled to damages up to the total amount of the cap. *EEOC v. Dinuba Medical Clinic*, 222 F.3d 580, 589 (9th Cir. 2000). Back pay, however, is not subject to the statutory cap like compensatory and punitive damages. *Passantino*, 212 F.3d at 509 n.14.

29. Non-pecuniary compensatory damages may be awarded for the following injuries suffered Meyer and Mercado: "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3).

30. Emotional pain and suffering may manifest in several ways, including: sleeplessness, anxiety, stress, depression . . . humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown.  EEOC Enforcement Guidance, 1992 WL 1364354 at * 4.  In calculating the non-pecuniary damages to award in this action, the Court has considered both the severity of the harm and its duration.  *Id.*

31. A sexual harassment victim's testimony alone is a sufficient basis to award compensatory damages for emotional pain and suffering. *EEOC v. Moser Foods*, 1997 WL 827398 (D. Ariz. 1997); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (upholding compensatory damages award based solely on victim's trial testimony); *Coleman v. Kaye*, 87 F.3d 1491, 1507 (3rd Cir. 1996) (concluding that a reasonable jury could credit Plaintiff's testimony about her emotional distress).

32. Meyer and Mercado are entitled to compensatory damages for the pain and suffering they experienced, and continue to experience, as a result of McBride's sexual harassment by McBride.

32. Punitive damages should be imposed upon Sunfire because Sunfire engaged in unlawful and egregious sexual harassment and constructive discharge "with malice or with reckless indifference to [Meyer's and Mercado's] federally protected rights. . . ." 42 U.S.C. § 1981a(b)(1).

1

2

3

33. Egregious or outrageous conduct is evidence of malice or reckless indifference, though the requisite mental state also may be established without such evidence. *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 535, 538 (1999).

4

5

6

7

8

9

10

11

12

13

14

34. The extreme, outrageous and egregious nature of McBride's sexual harassment of Meyer and Mercado is established beyond any doubt by consideration of all the circumstances: its frequency and duration; the severity by McBride's actual touching and rubbing of  various parts of Meyer's and Mercado's bodies, including on or near their vaginas, inside their thighs, shoulders and buttock; laughing out loud when Meyer and Mercado protested his misconduct as if such misconduct was humorous; his frequent public humiliation and embarrassment of Meyer and Mercado in the workplace in front of other Sunfire workers; and his utter disdain and disregard for Meyer's and Mercado's right to be free from unwanted sexual contact. *Faragher*, 524 U.S. at 787; *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000); *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 904 (9th Cir. 1994) (discussing factors to consider in awarding punitive damages under California law).

15

16

17

18

35. At all times relevant herein, McBride created a sexually objectionable environment that was both objectively and subjectively offensive, one that a reasonable woman (or man) would find hostile and abusive, and one that his victims, Meyer and Mercado,  did, in fact, perceive to be so. *Faragher*, 524 U.S. at 787.

19

20

21

36. Meyer and Mercado are entitled to punitive damages against Sunfire because McBride's misconduct was extreme, outrageous, criminal, egregious and malicious with a reckless indifference to Meyer's and Mercado's federally protected rights. 42 U.S.C. § 1981a(b)(1);  *Kolstad*, 527 U.S. at 538.

22

23

37. Pursuant to 42 U.S.C. §2000e-5(g), a district court may order "equitable relief as the court deems appropriate."

24

25

26

27

38.  Plaintiff EEOC's injunctive relief requested in its Complaint, and awarded herein,  does "not differ in kind from . . . what [was] demanded in the pleadings." Rule 54(c), FED.R.CIV.P. (docket # 1 at 4) Because the injunctive relief awarded to Plaintiff EEOC herein does not differ in kind from what was demanded in its Complaint, it is unnecessary

28

for the Court to address Plaintiff EEOC's alternative argument that Defendant Sunfire had sufficient notice of the requested relief awarded herein.   *Stafford v. Jankowski*, 338 F.Supp.2d 1225, 1228 (7th Cir. 2004) (citing *Appleton Elec. v. Graves Truck Line, Inc*., 635 F.2d 603, 610-11 (7th Cir. 1980) (due process concerns addressed when defendant was provided with amended requested relief sought by plaintiff in default hearing).

39. "Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination." *EEOC v. Goodyear Aerospace Corp*., 813 F.2d 1539, 1544 (9th Cir. 1987).

40. The EEOC is entitled to injunctive relief to eliminate Defendant Sunfire's discriminatory misconduct in the future and ensure that Defendant Sunfire has a meaningful policy prohibiting sexual discrimination and harassment in the workplace.

41. After considering all seven of the *Eitel* factors, which weigh heavily in favor of Plaintiffs and entry of default judgments, the Court concludes Plaintiffs are entitled to default judgments against Defendant Sunfire.

Accordingly,

**IT IS ORDERED** awarding Plaintiff Tineke Meyer the equitable remedy of back pay plus prejudgment interest through March 12, 2009 in the sum of $60,287.56; compensatory damages in the sum of $50,000.00; and punitive damages in the sum of $50,000.00; totaling $160,287.56 in damages against Defendant Sunfire Glass, Inc. The Clerk shall enter Judgment consistent with this Order with post-judgment interest at the legal rate until paid in full.

**IT IS FURTHER ORDERED** awarding Plaintiff Karina Mercado the equitable remedy of back pay plus prejudgment interest through March 20, 2009 in the sum of $6,781.56; compensatory damages in the sum of $50,000.00; and punitive damages in the sum of $50,000.00; totaling $106,781.56 in damages against Defendant Sunfire Glass, Inc. The Clerk shall enter Judgment consistent with this Order with post-judgment interest at the legal rate until paid in full.

**IT IS FURTHER ORDERED** that Plaintiff Equal Employment Opportunity

Commission is awarded injunctive relief against Defendant Sunfire Glass, Inc. as follows:

1. Defendant Sunfire Glass, Inc. is enjoined from discrimination on the basis of sex for a period of two (2) years from the date Judgment is entered.

2. Defendant Sunfire Glass, Inc. shall comply with the record keeping requirements of 29 C.F.R. 1602.14.

3. For a period of 24 months following entry of Judgment, Defendant Sunfire Glass, Inc. shall post a notice to all employees in at least three prominent in-house locations frequented by Sunfire Glass' employees. The notice shall explain Sunfire Glass' responsibilities and rights under Title VII, including the employees' right to work in an environment free from sexual harassment, and shall provide the address and telephone numbers of the Phoenix office of the Equal Employment Opportunity Commission and the Arizona Civil Rights Division. The notice shall be written in English and in Spanish.

4. Defendant Sunfire Glass, Inc. shall provide education and training on unlawful sex discrimination and sexual harassment to McBride and all its employees, according to the following terms:

A. The seminars shall include: (1) the subject of what constitutes sexual discrimination; (2) that Title VII is violated by sexual discrimination or sexual harassment; (3) how to provide a work environment free from sexual discrimination or sexual harassment; and (4) to whom and by what means employees may complain if they feel they have been subjected to sexual discrimination or sexual harassment in the workplace.

B. All training must be offered in English and in Spanish.

5. Within sixty (60) days of the entry of Judgment, Defendant Sunfire Glass shall develop written policies concerning sexual discrimination and sexual harassment, to conform to the law. These written policies must include at a minimum:

A. A strong and clear commitment to a workplace free of sexual discrimination and sexual harassment;

B. A clear and complete definition of sexual discrimination and sexual harassment;

C. A statement that sexual discrimination and sexual harassment is prohibited and will not be tolerated;

D. A clear and strong encouragement of persons who believe they have been subjected to sexual discrimination or sexual harassment to come forward;

E. The identification of specific individuals, internal and external to Defendant Sunfire Glass, with their telephone numbers, to whom employees, who have been subjected to sexual discrimination or sexual harassment, can report the unlawful conduct, including a written statement that employees may report the unlawful conduct to designated persons outside of their chain of management. The statement shall explain that should a non-English speaking employee seek to report sexual discrimination or sexual harassment, Defendant Sunfire Glass, Inc. shall retain an interpreter for purposes of taking the report and further communicating with the employee about the reported incidents;

F. An assurance that Defendant Sunfire Glass, Inc. will investigate allegations of sexual discrimination and sexual harassment promptly, fairly, reasonably and effectively, using appropriate investigators and that appropriate corrective action will be taken by Defendant Sunfire Glass, Inc. to make victims whole and eradicate unlawful conduct from the workplace.

G. A description of the consequences, up to and including termination that will be imposed upon violators of the policy;

H. A promise of maximum feasible confidentiality for persons who believe that they have been subjected to sexual discrimination and sexual harassment;

I. An assurance of non-retaliation for persons who believe they have been subjected to sexual discrimination and sexual harassment, and for witnesses.

These written policies shall be distributed to each of Defendant Sunfire Glass' current employees within **ninety (90) days** of the entry of Judgment. These policies shall be distributed to all new employees of Defendant Sunfire Glass, Inc. when hired. These policies also shall be posted, in English and Spanish, in a prominent place frequented by the employees at Sunfire Glass' workplace.

Plaintiff EEOC may verify full compliance with the injunctive relief entered herein as allowed by law. Enforcement of the injunctive relief awarded herein may be through a motion to enforce injunctive relief to invoke the district court's contempt powers. 18 U.S.C. § 401(3); *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987); *EEOC v. McLean Trucking Co.*, 834 F.2d 398 (4th Cir. 1987).

**IT IS FURTHER ORDERED** directing the Clerk shall enter Judgment consistent with this Order.

Dated this 10th day of April, 2009.

Lawrence O. Anderson
United States Magistrate Judge